1  MICHAEL T. JONES (SBN 290660)
   *MJones@goodwinlaw.com*
2  NICOLE L. CHESSARI (SBN 259970)
   *NChessari@goodwinlaw.com*
3  **GOODWIN PROCTER LLP**
   601 Marshall Street
4  Redwood City, California 94063
   Tel.: +1 650 752 3100
5  Fax: +1 650 853 1038

6

7  Attorneys for Plaintiff
   REPUTATION.COM, INC.

8

9              **UNITED STATES DISTRICT COURT**

10        **NORTHERN DISTRICT OF CALIFORNIA -**

11               **SAN FRANCISCO DIVISION**

12  REPUTATION.COM, INC., a Delaware          Case No. 3:21-cv-7340
    Corporation,
13
                 Plaintiff,                   **COMPLAINT FOR:**
14
         v.                                   **1. RESCISSION/REFORMATION; AND**
15                                            **2. FRAUD**
    MICHAEL MULLARKEY, SOCIAL
16  MECCA, INC. D/B/A NUVI, and FORTIS
    ADVISORS LLC (SOLELY AS THE              **DEMAND FOR JURY TRIAL**
17  STOCKHOLDERS' AGENT),

18               Defendants.

19
            **REDACTED VERSION OF DOCUMENT SOUGHT TO BE**
20                            **SEALED**

21

22

23

24

25

26

27

28

Plaintiff Reputation.com, Inc. ("Reputation" or "Plaintiff") hereby complains and alleges against Defendants Michael Mullarkey ("Mullarkey"), Social Mecca, Inc. d/b/a Nuvi ("Nuvi"), and Fortis Advisors LLC (solely in its capacity as the Stockholder's Agent, "Fortis") as follows:

## INTRODUCTION

1.   This is a case about a dishonest businessman with a track record of lying about his company's revenue to benefit himself.  Defendant Mullarkey—the largest Nuvi shareholder (43.3%), through what Reputation believes is his wholly owned entity, ODK Capital Management, LLC ("ODK")—defrauded Reputation into acquiring and merging with Social Mecca, Inc. d/b/a Nuvi and d/b/a Brickfish ("Nuvi") through fraudulent representations about Nuvi's historical revenue and annual recurring revenue ("ARR").

2.   In particular, Mullarkey lied and falsified records regarding what he claimed to be Nuvi's largest customer, Hertz Corporation and certain of its affiliated entities including Hertz Car Sales, Thrifty, and Dollar ("Hertz"), to make it appear as though Nuvi's prospects were over $4 million brighter than they were to make Nuvi more desirable to prospective buyers. Throughout the negotiations, Mullarkey represented to Reputation that Nuvi had $4.7 million of "bad debt" with Hertz and Hertz-affiliated entities ("Hertz"), which factored into the Nuvi financial statements that Mullarkey provided to Reputation.  Mullarkey represented to Reputation that Hertz filed for bankruptcy, that Nuvi submitted a timely claim in the bankruptcy proceedings as a creditor, and that Hertz submitted a proposed plan in the bankruptcy proceedings that, if approved, would result in a 70% cash recovery to general unsecured creditors, including Nuvi.  In turn, in addition to convincing Reputation to pay more for Nuvi than it was worth

3.   However, the Hertz "bad debt" was never collectable, and Mullarkey knew it. Most of the Hertz "revenue" was based upon fake and backdated invoices created by Mullarkey months after Hertz initiated bankruptcy proceedings.  Mullarkey referenced Purchase Orders in those invoices as support to make them look more authentic and believable, but those Purchase

Orders do not correspond with the invoiced services and/or had already been exhausted by other invoiced services.  And Reputation subsequently confirmed that Nuvi never even provided the services to Hertz that are described in those sham invoices.

4.   Aware that these invoices were fake and not collectable, Mullarkey did not file a timely bankruptcy claim with the court.  Rather, to cover his tracks, just a few weeks before the Merger closed Mullarkey caused Social Mecca, Inc. d/b/a Brickfish to file a fraudulent bankruptcy claim for $4.7 million—many months after such claims were barred by the court—to make it appear to Reputation that this revenue would be collectable through those bankruptcy proceedings.  Mullarkey supported this bankruptcy claim with the fake invoices and unrelated Purchase Orders, and represented on the claim form that he was simply amending a nonexistent claim filed by Social Mecca, Inc. d/b/a Brickfish back in June 2020.

5.   In addition, Mullarkey on several occasions misrepresented Nuvi's ARR, initially inflating it by nearly $10 million.  Before the Agreement and Plan of Merger and Reorganization ("Merger Agreement"), attached hereto as Exhibit A (excluding schedules), was even executed, Mullarkey was caught in a lie as to Nuvi's ARR.  As a result, the parties renegotiated the terms of the merger, ██████████████████████████████████████████████████████████████████████████████████████████. Unfortunately, Mullarkey was still able to conceal the full extent of his fraudulent scheme to inflate ARR by pushing to close the deal as quickly as possible, urging Reputation to expedite its due diligence process.

6.   On April 23, 2021, Reputation acquired Nuvi (the "Merger").  In the end, the Merger Agreement memorialized ████████████████████████████████████████████, based upon Mullarkey's and Nuvi's representations.  And this was in line with Nuvi's representation that it earned $9.4 million in revenue in 2020.

7.   Yet, despite the renegotiations and Mullarkey's ability and numerous opportunities to come clean about Nuvi's actual ARR, after the transaction closed, Reputation learned that Nuvi's ARR is a fraction of that amount—only around $5 million.  Reputation further learned that 2020 revenue was overstated by, at least, $3.2 million—bringing it closer to a maximum of

3

$6.2 million.

8.   Through these blatant lies, Mullarkey successfully convinced Reputation to pay a higher premium to acquire Nuvi than it would have paid had it known the truth.  If it were not for Mullarkey's and Nuvi's fraudulent misrepresentations, Reputation would not have entered into the Merger Agreement under the agreed-upon financial terms.  Reputation believes that Mullarkey (and through Mullarkey, Nuvi) intended to induce Reputation's reliance on Mullarkey's misrepresentations in order to mislead Reputation into overpaying for Nuvi and into front loading more of the total consideration rather than making more contingent upon revenue achievements.

9.   This action seeks to hold Mullarkey accountable for his unlawful actions and to partially rescind and/or reform the Merger Agreement governing Reputation's acquisition of Nuvi, to set the upfront consideration at an amount proportionally consistent with the reduction in true Nuvi ARR.  Given that the actual Nuvi ARR was approximately 56% of the amount represented by Mullarkey and Nuvi to Reputation, Reputation seeks to reduce the consideration Reputation agreed to pay to acquire Nuvi by roughly 44%.  Specifically, Reputation seeks to reduce total consideration from ███████████████ reducing upfront consideration from ███████████████████, and reducing potential earn out consideration from ████████████.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action because the parties consented to the jurisdiction of this Court pursuant to Section 6.8(b) of the Merger Agreement ("Forum Selection Clause"), which states as follows:



11. Venue is proper in the Northern District of California, San Francisco Division under 28 U.S. Code section 1391, by consent pursuant to the Forum Selection Clause.

## PARTIES

12. Reputation is a Delaware Corporation with its principal place of business located in Redwood City, California.  Reputation is a business-to-business online reputation experience management and customer experience company, which operates and conducts its business throughout the State of California, including this District.

13. Nuvi is an Illinois Corporation with its principal place of business located in Lehi, Utah.  Nuvi is a technology company which offers an enterprise customer experience management and social analytics software platform. Nuvi's platform helps customers listen, plan, publish, engage, analyze, locate, review, and capture their way to better customer experiences. The software is offered as a software-as-a-service ("SaaS") solution with paid add-on re-occurring professional services (e.g. dedicated analyst or developer support and services) and non-recurring professional services (training and implementation).

14. On information and belief, Mullarkey is a resident of Chicago, Illinois and served as Nuvi's Chief Executive Officer ("CEO") from approximately April 2011 until the Merger closed.

15. Fortis is a Delaware limited liability company with its principal place of business located in San Diego, California.  Fortis is the agent for the former Nuvi stockholders and is a named defendant solely in that capacity.

## FACTUAL ALLEGATIONS

16. With the goal of selling his company and making as much money as possible, Mullarkey, the largest Nuvi shareholder through ODK, was desperate to make Nuvi's financials look as strong as possible.  However, one of Nuvi's largest customers—Hertz—was struggling financially and cut back on the services purchased from Nuvi.

17. Ultimately, on May 22, 2020, Hertz filed voluntary petitions for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the District of Delaware.  Hertz notified Mullarkey via email on May 23, 2020 about the bankruptcy filing and informed him that "any payments owed by [Hertz] to a supplier or vendor for goods delivered or services rendered prior to [Hertz's] May 22, 2020 filing cannot be paid at this time without specific authorization from the Court. Vendors seeking payment of these 'pre-petition' claims will need to do so through the reorganization process. Our claims agent, who will be managing the claims process, will be mailing full information about submitting a claim for any unpaid pre-petition goods or services." The email also included a link to a website with detailed information about the claims process.

18. Thus, in sum, any creditors who provided services to Hertz prior to May 2020, were entitled to file claims with the court to recover money owed.  And, from an accounting perspective, any invoices sent to Hertz prior to May 2020 could be considered collectable and the revenue and receivables could be appropriately recognized accordingly.  Any invoices sent to Hertz thereafter could not reasonably be considered collectable receivables and therefore revenue could not be recognized.

19. On information and belief, Mullarkey saw this as an opportunity to artificially inflate Nuvi's financial statements and business prospects to look better than they were to make Nuvi more attractive to potential acquirers.  In turn, although Nuvi discontinued Hertz Corporation's access to its software in June 2019 and provided no services to Hertz Corporation in 2020—facts which, on information and belief, Mullarkey knew or should have known—on August 10 and 11, 2020, Mullarkey created four invoices to Hertz Corporation totaling $3,098,907.12.  Mullarkey backdated one invoice for $187,500 to October 1, 2019.  Mullarkey backdated the other three invoices totaling around $2.9 million to January 1, 2020.  Mullarkey referenced various Purchase Orders on those fake invoices to make them appear legitimate, but those Purchase Orders had already been exhausted and the services described in those Purchase Orders did not line up with the services described in the invoices.  Mullarkey knew that the true billing dates for these invoices would make collectability of these amounts much less likely, and intentionally changed the dates to knowingly and fraudulently artificially inflate Nuvi's revenue.

6

20. A few months later, in or around October 2020, Reputation began exploring the possibility of acquiring and merging with Nuvi.  During the transaction negotiations Mullarkey was Reputation's point of contact and primary purveyor of Nuvi's company information—including its revenue and ARR.  Indeed, until around January 2021, Mullarkey was hesitant to involve, and did not involve, any other Nuvi employees in due diligence because he did not want to "spook" his team.

21. Reputation is informed and believes that Mullarkey maintained close control over Nuvi's Quickbooks accounting database at all relevant times.  Reputation is further informed and believes that Mullarkey was personally involved in many of the Nuvi customer relationships and knew or could readily ascertain the status of each Nuvi customer through Nuvi's Salesforce database which was regularly updated and kept fairly current by the Nuvi sales team.

22. On October 9, 2020, Reputation requested from Mullarkey Nuvi financial statements and revenue by customer account.  Mullarkey responded that day with a profit and loss statement for 2018 and 2019 and that he would work on the year to date and year-end balance sheets himself, without "asking 20 questions from [Nuvi's] CFO."

23. On October 18, 2020, Mullarkey provided Reputation with financial statements ending September 30, 2020, purporting to show Nuvi's 2019 revenue of over $18 million and estimated 2020 revenue of over $15 million, based in part on $7 million in revenue in the first two quarters of 2020, estimated third quarter revenue of $3.6 million, and projected revenue of $4.1 million in the fourth quarter.  On information and belief, these financial statements included, at least, $187,500 of revenue attributed to Hertz in 2019 which did not actually exist and another $2.9 million of revenue attributed to Hertz in 2020 which did not actually exist.  Mullarkey further represented that there would be an uptick in revenue during the fourth quarter of 2020 due to several new accounts and provided a 2021 Budget projecting $22 million in revenue in 2021 based on expected new sales wins.  Notably, he also stated that there had been "no customer churn since 6/30[.]"

24. On October 18, 2020, Mullarkey also provided Reputation with a spreadsheet purporting to show ARR (with customer names redacted) as of September 30, 2020.  Through

7

that detailed, customer by customer, spreadsheet, Mullarkey represented to Nuvi that ARR as of September 30, 2020 was $14,365,797.  This spreadsheet contained a "Start Date" column, populated entirely with dates on or before September 30, 2020, leading Reputation to justifiably believe that this ARR calculation encompassed only actual deals closed rather than deals still in the pipeline.  It was also in line with Mullarkey's representation that 2020 revenue would be around $15 million.

25. On and before November 5, 2020, Reputation sent follow-up inquiries to Mullarkey stating that it wanted to understand, among other things, the churn rates in 2019 and 2020, the impact of mergers in the ARR numbers, and organic vs. inorganic growth.  On November 6, 2020, Mullarkey responded that he would pull and provide the requested churn information.  Mullarkey further stated, "[w]e have two large pending deals to expand our Amazon relationship totally replacing Sprinklr 1200 seats, which will lead to a $1.6 mm ARR for NUVI. We met with their teams and submitted budgets last week. We are getting them locked in for 24 months at $1,644,333 per year. no guarantees, we will know by year-end[.]"  He also provided a spreadsheet detailing expected new bookings for the second, third and start of the fourth quarter of 2020, which represented an expected $3.25 million of new total contract value, in addition to the purported Amazon deal.

26. In reliance of the foregoing representations, on November 9, 2020, Reputation provided Nuvi with a Letter of Intent to acquire Nuvi for $60 million total consideration consisting of $30 million in cash and $30 million worth of Reputation common stock (16.2 million common shares in Reputation, most of which would only be paid if certain specified ARR growth was achieved), with a hold back of 10% of total consideration ($10 million) for indemnification claims, pending further confirmatory due diligence.

27. Also on November 9, 2020, Reputation followed up with Mullarkey asking again for the churn reports requested back on November 5, 2020.  Reputation emphasized the importance of this information stating "[w]e really need those."  Mullarkey responded that day stating that he was still working on the churn numbers.  On November 10, 2020, Mullarkey stated that he hired an outside accountant to work on this and provided the percentage of churn for the

8

last three years, but did not provide the actual revenue or ARR numbers attributed to the churn.

28. On November 18, 2020, Mullarkey responded to the Letter of Intent, seeking to have Reputation increase the proposed total consideration to $74 million, consisting of $37 million in cash and $37 million worth of preferred shares with no earn out criteria, and to lower the indemnity holdback to 3% of total consideration.

29. The parties engaged in various discussions thereafter and on December 3, 2020, Reputation provided Nuvi with a revised Letter of Intent. While the total consideration offered did not change from the $60 million offered on November 9, 2020, Reputation agreed to increase the upfront cash consideration from $30 million to $40 million, to remit $20 million worth of Reputation preferred stock (5,376,344 shares) at closing, and to remove any earn out requirements as pre-conditions to the stock consideration. The Revised Letter of Intent maintained the hold back of 10% of total consideration for indemnification claims and added a requirement that it would be forfeited entirely if 85% of the committed ARR from Nuvi customers existing at the time of closing is retained for at least 12 months following the closing ("ARR Threshold"). The Revised Letter of Intent remained subject to further confirmatory due diligence.

30. On December 9, 2020, Mullarkey responded to the Revised Letter of Intent, agreeing to the total consideration and structure, but proposing to delete the forfeiture of the hold back if the ARR Threshold was not achieved. In response, on December 13, 2020, Reputation sent a Second Revised Letter of Intent, keeping the proposed consideration and structure the same, but creating a tiered structure for forfeiture of the hold back depending on the "ARR renewal rate." For example, Reputation proposed that if the ARR renewal rate was 80% or above, Reputation would have no claim on the hold back. If it was 79% to 80%, 10% of the hold back would be forfeited. If it was 78% to 79%, 20% of the hold back would be forfeited. The continued incrementally down to the entire hold back being forfeited if the ARR renewal rate was under 75%.

31. Yet again, Mullarkey—on information and belief, knowing full well that the ARR he represented was fraudulently inflated—took issue with forfeiting any consideration based on

ARR.  On December 15, 2020, Mullarkey responded proposing a structure whereby lost ARR could be replaced by newly achieved ARR and stated "Main item-with the ARR hurdle, we need to discuss control over retaining and achieving revenue targets and renewal outcome and trigger if resources or staff is changed removed or material adverse change to business[.]"

32. After some additional negotiations and discussions between Reputation and Nuvi, on December 18, 2020, Reputation submitted a Third Revised Letter of Intent—which Nuvi accepted that same date—largely in line with the December 13th Second Letter of Intent. Specifically, Reputation proposed to acquire Nuvi for $60 million consisting of $40 million up front cash plus 5,376,344 million Reputation preferred shares valued at around $20 million (without any pre-conditions to earning the stock), and containing a tiered forfeiture of the 10% holdback, contingent upon due diligence, to which Nuvi and Mullarkey agreed.

33. Thereafter, Reputation and Nuvi soon began the due diligence process, which Mullarkey insisted should be an expedited process as he tried to push the Merger to closure as quickly as possible before his fraud could be discovered.  Throughout due diligence, Reputation was focused on Nuvi revenue, customer contracts, and ARR.  On December 20, 2020, Reputation asked Mullarkey to start informal due diligence with him and Nuvi's Chief Financial Officer the next day "with one focus: customer contracts" and asked Mullarkey to help "with loading all customer contracts into the secure [shared] folder[.]"  Nearly two weeks passed without receiving this information from Nuvi or Mullarkey.

34. On December 20, 2020, Reputation expressed to Mullarkey "[t]here are a lot of people who are very concerned with the DD process in general and the current pace of any document flow is not helping…I want help with customer contracts before we meet tomorrow. Can you provide the top 5 or better yet the top 10 contracts for us to start reviewing?  Our goal with customer contracts is simple – we will read each contract, pulling the following fields: 1) start / end date[;] 2) ARR[.]  I suspect there will be between 300 to 500 contracts to read and I want to start this so we go through in order of size."  Mullarkey responded later that day ensuring Reputation that Nuvi "want[s] to present the correct data" and providing "a bunch of agreements the team can start reading thru[.]"  It was not until January 8, 2021, that Nuvi finally loaded a

10

1  small fraction of its purported customer agreements into the data room.

2      35. On February 1, 2021, Nuvi's Chief Financial Officer finally provided financial

3  statements to Reputation, including cash flow statements, balance sheets, and income statements

4  for each of 2018, 2019 and 2020.  Notably, the 2020 income statement represented that Nuvi's

5  2020 revenue was only $9.4 million—in stark contrast to Mullarkey's October 18, 2020

6  representation that 2020 revenue would be around $15 million for 2020 and that, at that point,

7  over $9 million in revenue had already been achieved in the first three quarters alone.  Likewise,

8  the 2019 income statement represented that Nuvi's 2019 revenue was only $11.87 million versus

9  the October 18, 2020 representation that 2019 revenue was $18 million.

10      36. Similarly, on February 2, 2021, Nuvi's Chief Financial Officer loaded a

11  spreadsheet into the data room containing detailed, customer by customer information regarding

12  ARR and purporting to show that Nuvi had $9.188 million in ARR, including $1.588 million in

13  "yellow" ARR and $434,200 in "red" ARR—in stark contrast to Mullarkey's October 18, 2020

14  representation that ARR as of September 30, 2020 was $14.365 million.  This spreadsheet

15  contained the following summary of this ARR information:

| | | |
|---|---|---|
| Total | 9,188,769.00 | |
| Green | 7,165,761.00 | (all black account status) |
| Yellow | 1,588,808.00 | |
| Red | 434,200.00 | |

20      37. After Reputation learned that Nuvi's ARR was not over $14 million but instead a

21  purported $9.188 million, Reputation's Chief Executive Officer sought to renegotiate the terms of

22  the acquisition with Mullarkey and Nuvi.  On February 13, 2021, Reputation's CEO discussed

23  with Mullarkey the fact that ARR was much lower than previously represented and it could not

24  enter into the deal based on the economics offered in the December 18, 2020 Third Revised Letter

25  of Intent.  During that call Reputation's CEO also sought clarification about the "yellow" and

26  "red" classifications and Mullarkey explained that he was responsible for the color codes applied

27  to particular customer accounts and "yellow" meant there was an issue that Mullarkey needed to

28

1   resolve with the customer and "red" meant that there was an unresolved customer issue with

2   respect to a product or contract, but that Mullarkey believed that both categories represented

3   revenue he expected to achieve.  Mullarkey also explained that there was another category of

4   "blue" ARR of around an additional $1 million in deals he expected to close that were in the last

5   stages of contracting and out for signature.  Reputation's CEO explained to Mullarkey that, based

6   on the materially lower-than-represented ARR, Reputation was reducing its offer to purchase

7   Nuvi from a total consideration of $60 million down to total potential consideration of █████

8   ███████████████████████████████████████████████████████████████

9   ████████████████████████████████████████.  Reputation's CEO

10  followed up the next day with a PowerPoint containing a summary of the prior day's discussion,

11  which set forth the following revised proposal based on the revised $9 million ARR represented

12  by Nuvi and Mullarkey.

13          38. On February 15, 2021, Nuvi, through its banker, Alantra, provided a counter

14  proposal, attempting to revive Reputation's prior offer of $60 million total consideration.

15  Specifically, the counter offer contemplated ███████████████████████████████

16  ███████████████████████████████████████████████

17          39. On February 20, 2021, Reputation sent Nuvi and Mullarkey a Fourth Revised

18  Letter of Intent, based upon what Reputation was induced into believing was Nuvi's actual ARR

19  of $9 million.  Reputation agreed to revert to the offer of ████████ total consideration to

20  purchase Nuvi, but revised the financial terms from the prior December 13, 2020 Letter of Intent

21  by: █████████████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████████████████

23  ███████████████████████████████████████████████████████████████

24  ███████████████████████████████████████████████████████████

25  ████████████████████████████.  Based on Nuvi's and Mullarkey's representations that

26  ARR was $9.188 million, but also factoring in the risk that some of the "yellow" and "red" ARR

27  may fall through, the Fourth Revised Letter of Intent stated, "█████████████████████

28  ███████████████████████████████████████████████████████████████

1 ███████████

2       40. Thus, while total consideration proposed in the Fourth Revised Letter of Intent

3 remained at ███████████ of that was made contingent upon certain post-close ARR

4 requirements, and based on an understanding that ARR at closing was at least ██████.  The

5 Fourth Revised Letter of Intent also changed the hold back amount to ████ of the upfront cash

6 payment, or █████, rather than ███ of total consideration.  Nuvi executed the Fourth Letter

7 of Intent, accepting its terms, on February 21, 2021.  Shortly thereafter, the parties began drafting

8 the Merger Agreement to memorialize those terms.

9       41. On March 1, 2021, Alantra loaded an updated ARR spreadsheet to the data room

10 purporting to show that Nuvi had over $11 million of ARR, but that only $7.55 million of that

11 ARR was from accounts classified as "Billing, up and running. Healthy."  The below chart from

12 this spreadsheet contains the summary breakdown of ARR as represented through this

13 spreadsheet:

| Total ARR | $ 11,057,705.85 | |
|---|---|---|
| Black | 7,553,478.85 | Billing, up and running. Healthy. |
| Blue | 913,219.00 | Stage 5- Selected/Contracts out for signature |
| Green | 1,060,008.00 | 4 - Contract Negotiation/Legal |
| Yellow | 1,096,800.00 | Issue for MM to resolve |
| Red | 434,200.00 | Product/Contract or unresolved Customer issue |

| Enterprise | Over $10k | $ 9,597,847 |
|---|---|---|
| SMB | Under $10k | $ 1,459,859 |

20       42. On information and belief, Mullarkey assigned these color coded classifications to

21 each purported deal.  On information and belief, Mullarkey also added commentary to this

22 spreadsheet explaining the status for many of the Blue, Green, Yellow, and Red deals that were

23 pending but not yet closed.

24       43. Based on representations by Mullarkey that the $7.55 million in "Black" ARR

25 were healthy and certain accounts for ARR, that "Blue" and "Green" deals were highly likely to

26 close in the near term, and that the "yellow" and "red" accounts constituted current ARR that

27 Mullarkey strongly believed he could "save," Reputation agreed to maintain the consideration and

13

related terms set forth in the Final Letter of Intent, including various terms that relied upon Nuvi's then-current ARR being at least $9 million (Black + Yellow + Red), which was memorialized in the Merger Agreement as the definition of "Closing ARR."  Specifically, the Merger Agreement provides " ███████████████████████████████████████████████████████████
███████████

44. On March 6, 2021, Alantra loaded a document purporting to show "Rev[enue] by Customer and Type" to the data room, purporting to show that Nuvi had over $9.4 million of revenue in 2020—with $2.9 million of that revenue purportedly derived from Hertz.  It also purported to show that Nuvi had $11.87 million in revenue in 2019, with $2.75 million in revenue purportedly derived from Hertz.

45. Indeed, throughout the due diligence process, Mullarkey repeatedly touted the outstanding receivables owed by Hertz and that he was confident that Nuvi would recover a large portion of the outstanding $4.7 million purportedly owed by Hertz through the bankruptcy proceedings.  For example, on March 2, 2021, Mullarkey emailed Reputation stating, "As discussed bids for our debt and restarting with [Hertz;] plan would allow them to exit by summer, creditors could get 70% on the dollar[.]"  However, on information and belief, despite Mullarkey being on notice since on or around September 16, 2020 that any creditor claims not filed by October 21, 2020 would be barred, he did not file a Proof of Claim in the bankruptcy proceeding on behalf of Brickfish until March 29, 2021.  That belated Proof of Claim was supported, in part, by (a) the fake and backdated invoices created by Mullarkey in August 2020, (b) four other invoices totaling nearly $800,000 which, as of March 8, 2021, Hertz's accounts payable and procurement departments could not locate—a fact conveyed to Mullarkey on March 15, 2021, and (c) the Purchase Orders referenced in those invoices that had no correlation to the invoiced services and/or had already been fully exhausted as of the invoice date.

46. In an effort to conceal this belated bankruptcy filing from Reputation, Mullarkey falsely attested in the March 29, 2021 Proof of Claim that it amended a claim filed on June 17, 2020.  Mullarkey likewise caused Nuvi to represent in the Merger Agreement ██████████
███████████████████████████████████████████████████████████████████████████

██████████████████████████ No such claim is on the website of Prime Clerk, the

claims agent for the Hertz bankruptcy proceeding, which is where the March 29, 2021 claim

appears and where any other claim would appear if it were actually filed.

47. On or about March 2021, based in part on Mullarkey's insistence that the deal

close quickly, the financial due diligence ceased.  At that time, Reputation did not have sufficient

ability to thoroughly dig into Nuvi's financial condition.  In turn, the parties agreed that

███████████████████████████████████████████████████████████████

On April 23, 2021, the Merger Agreement was executed and the Merger closed.  Reputation

ultimately agreed to pay a total consideration ██████████████████████████████

██████████████████, with around ███████████ in upfront remuneration (consisting of

████████ in cash and the remainder in stock), and ██████████ in cash through earn-outs which

were contingent upon certain ARR thresholds being achieved.

48. Mullarkey, through ODK and another entity that Reputation believes he owns

(Galway Holdings), personally received over ████████ from the transaction, plus around ██

████ worth of equity in Reputation (which Reputation intends to place into an escrow account

pending resolution of this case).

49. Shortly after Closing, Reputation's finance team gained access to Nuvi's

Salesforce, NetSuite, and Quickbooks databases containing customer contracts, billing, and

revenue information.  Reputation began cross checking customer contracts provided during due

diligence and the list of purported Nuvi accounts and ARR from those accounts provided to it by

Nuvi against records in these financial databases and discovered various discrepancies between

Mullarkey's representations and reality.  Contrary to Mullarkey's October 18, 2020 representation

that there had been "no customer churn since 6/30[/20,]" Reputation discovered that eleven Nuvi

accounts churned between July 1, 2020 and October 1, 2020, accounting for nearly $100,000 of

potential ARR that Nuvi recently lost.  But more importantly, Reputation learned that Nuvi's

Closing ARR as of April 30, 2021 (based on actual billings) was actually closer to $5.2 million—

less than half of the ARR figure represented by Nuvi and Mullarkey to Reputation and $2.3

million less than what Mullarkey represented as the customer accounts that were "Billing, up and

15

1    running.  Healthy."

2         50. In or around May 2021, Reputation confronted Mullarkey about the ARR

3    discrepancy.  In turn, Mullarkey finally came clean, to some extent.  He reviewed the 557

4    customer deals represented pre-close to be "Billing, up and running. Healthy[,]" and conceded

5    that 133 of the those—valued at around $1.1 million in ARR—was attributed to former Nuvi

6    customers who failed to renew agreements with Nuvi pre-close, referred to as "churned"

7    accounts.  Indeed, Reputation later learned that many of these accounts churned in 2020—well

8    before Mullarkey caused false ARR data to be delivered to Reputation and well before he

9    confirmed the color-coding classifications to Reputation's CEO.  Without question, Mullarkey—

10   who was heavily involved in the day-to-day aspects of managing and overseeing Nuvi customer

11   accounts—knew or should have known two months earlier that these accounts were not "healthy"

12   accounts expected to continue utilizing Nuvi's products and contributing to revenue.

13        51. However, even Mullarkey's purported attempt to come clean was a lie.  Upon

14   examination of actual billings from the NetSuite system, Reputation further discovered that an

15   additional 92 purported customer deals—totaling approximately $491,000 of ARR represented by

16   Mullarkey and Nuvi throughout due diligence—churned (and did not re-activate their accounts)

17   between January and April 2021, during the pre-close due diligence period.

18        52. Reputation further discovered that around $1.34 million of those purportedly

19   "healthy" accounts that Mullarkey represented were "Billing, up and running" were accounts that

20   Mullarkey conceded post-closing that he was trying (unsuccessfully) to "save."  According to

21   Mullarkey, those included, among others (a) the Hertz account which was "currently paused due

22   to bankruptcy and covid," (b) a "[b]anking client that cut back because of covid," (c) a "really

23   promising opportunity" that was "lost in March 2021," (d) one that was "going to renew and

24   upgrade" but "at the last moment the departments budget got cut and the social media

25   management was moved" to a different office and "was officially closed lost in Feb 2021," (e) an

26   event that was canceled due to covid, (f) one where "[r]enewal was uncertain and this customer

27   ended up canceling."  Reputation also discovered that around $37,000 in ARR was overstated

28   from legitimate deals.  In addition, of the additional $3.5 million in "Green" and "Blue" deals

represented by Mullarkey as very likely to close and the "yellow" and "red" accounts that Mullarkey strongly believed he could "save," only around $534,000 ARR was actually derived from such deals—the other roughly $3 million of purported ARR was attributed to deals that either fell through ($714,500), were fabricated by Mullarkey ($1.2 million), or that remained uncertain as of April 30, 2021 ($1.14 million).

53. To make matters worse, in or around June 2021, Reputation discovered that four Hertz invoices were backdated by Mullarkey.  Reputation further discovered in or around August 2021 that all of those invoices were fake—Social Mecca/Brickfish did not provide Hertz with any of the services set forth in those invoices.  Given that this revenue could not be recognized because they post-dated the bankruptcy claim and were not legitimate, it rendered Nuvi's representations as to Nuvi's 2020 revenue intentionally overstated by $2.91 million and Nuvi's 2019 revenue was intentionally overstated by $187,500.

54. Reputation also discovered problems with additional Hertz invoices submitted by Mullarkey with the March 29, 2021 bankruptcy claim that he caused Brickfish to file, including that Hertz did not have a record of four of the invoices, the invoices (also prepared by Mullarkey) referenced services that Nuvi did not provide to Hertz, and the invoices were not supported by a Purchase Order.  Ultimately, Reputation determined that, at most, approximately $150,000 of the $4.7 million belatedly claimed remuneration could be valid, but even that would be difficult to support.  In turn, Reputation had no choice but to withdraw the Hertz bankruptcy claim filed by Mullarkey.

55. Accordingly, Mullarkey's intentional misrepresentations caused Reputation to negotiate the Merger Agreement's terms without knowledge of Nuvi's actual ARR and revenue and without knowledge of the true status of the Hertz bankruptcy claim filed by Mullarkey, to the detriment of Reputation.  Reputation justifiably relied on Mullarkey's deception by completing the Merger with financial terms it would have not agreed had it known the true state of affairs.

## FIRST CAUSE OF ACTION
### Partial Rescission/Reformation
### (Against All Defendants)

56. Reputation hereby incorporates by reference each of the allegations in the

17

preceding paragraphs as though fully set forth herein.

57. As described above, Reputation's consent to the Merger Agreement was induced by fraud, given by mistake and/or exercised with the connivance of Mullarkey and Nuvi.  Based on Mullarkey's and Nuvi's misrepresentations to Reputation as to Nuvi's revenue and ARR, and Nuvi's relationship with Hertz, Reputation erroneously believed that Nuvi was correctly valued and that it purchased Nuvi for a fair price.  It would not have purchased Nuvi for the consideration set forth in the Merger Agreement, but for its reasonable belief in, and justifiable reliance on, these falsehoods.

58. Mullarkey intentionally misrepresented these falsehoods to Reputation, he intended for Reputation to rely on them and pay a higher price for the acquisition of Nuvi than it would have paid had it known the true state of affairs that were intentionally concealed by Mullarkey.

60. As a result of Mullarkey's conduct, Reputation has sustained damages in an amount to be determined at trial.  Reputation is entitled to partially rescind and/or reform the Merger Agreement and receive restitution in an amount to be determined according to proof at trial.

### SECOND CAUSE OF ACTION
**Fraud**
**(Against Defendants Michael Mullarkey and Nuvi)**

61. Reputation hereby incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth herein.

62. Through the acts alleged herein, Mullarkey and Nuvi (through Mullarkey) concealed material facts from Reputation and/or made affirmative misrepresentations to Reputation in connection with its purchase of Nuvi.

63. Mullarkey's and Nuvi's misrepresentations include, but are not limited to, the following:

    a.   That Hertz owed Nuvi $4.7 million for services provided in 2019 and 2020.

18

b. That at least 70% of that $4.7 million from Hertz would likely be collected through the Hertz bankruptcy proceedings.

██████████████████████████████████████████

d. That Nuvi ARR as of September 30, 2020 was $14,365,797.

e. That Nuvi's revenue for the first two quarters of 2020 was $7 million, estimated third quarter 2020 revenue was $3.6 million, and, as of October 18, 2020, projected to be over $15 million for the full year 2020.

f. That as of October 18, 2020, there had been "no customer churn since 6/30/[20.]"

g. That Nuvi's 2020 revenue was $9.4 million.

h. That Nuvi's 2019 revenue was over $18 million, and then that it was $11.87 million.

i. That Nuvi's ARR as of February 2, 2021 was $9.188 million.

j. That, as of March 1, 2021, Nuvi's ARR was over $11 million with around $7.5 million of that "Billing, up and running. Healthy[,]" around $2 million highly likely to close in the near term, and around $1.5 million that were current ARR that Mullarkey strongly believed he could "save."

64. Mullarkey's and Nuvi's representations to Reputation described above were false.

65. Mullarkey and Nuvi (though Mullarkey) knew these representations were false at the time they made them.

66. Mullarkey and Nuvi (through Mullarkey) intended to induce Reputation's reliance on their concealment, and affirmative misrepresentation of, these material facts in order to mislead Reputation into, among other things: (1) believing that the valuation of Nuvi was higher than it is, (2) overpaying to acquire Nuvi; and (3) structuring the acquisition of Nuvi with more up front consideration than it should have and less consideration contingent upon certain earn out conditions.

67. Reputation justifiably relied on Mullarkey's and Nuvi's misrepresentations by

1  completing the Merger and distributing to the former Nuvi shareholders, including Mullarkey,

2  ██████████ of which $8,538,271.55 went to Mullarkey personally, through entities owned by

3  Mullarkey.

4        68. As a result of the conduct alleged herein, Mullarkey has been and will be unjustly

5  enriched in an amount to be proven at trial.  Mullarkey's unjust enrichment includes, but is not

6  limited to, his receipt of substantial payments of cash from Reputation in connection with the

7  Merger Agreement.

8        69. As a result of Mullarkey's and Nuvi's actions, Reputation has sustained damages

9  in an amount to be determined at trial.

10        70. Mullarkey and Nuvi (through Mullarkey) performed the foregoing acts, conduct,

11  and omissions fraudulently, oppressively, and maliciously, with the intent and design to damage

12  Reputation.  By reason of this conduct, Reputation is entitled to recover punitive damages in an

13  amount to be determined at trial.

14  **PRAYER FOR RELIEF**

15  WHEREFORE, Plaintiff prays for the following relief:

16      1.  Judgment in Reputation's favor and against Defendants on all causes of action

17  alleged herein;

18      2.  For damages in an amount to be proven at trial;

19      3.  For punitive damages;

20      4.  For partial rescission and/or reformation of the Merger Agreement and restitution

21  in an amount to be proven at trial;

22      5.  For disgorgement of ill-gotten gains;

23      6.  For attorneys' fees and costs of suit incurred herein as allowed by law and

24  contract;

25      7.  For such other and further relief and remedies as the Court may deem to be just

26  and equitable under the circumstances.

27

28

1  Dated: September 21, 2021            Respectfully Submitted,

2

3                                       By: /s/ Nicole L. Chessari
                                        Michael T. Jones (SBN 290660)
4                                       *MJones@goodwinlaw.com*
                                        Nicole L. Chessari
5                                       *NChessari@goodwinlaw.com*
                                        **GOODWIN PROCTER** LLP
6                                       601 Marshall Street
                                        Redwood City, California 94063
7                                       Tel.: +1 650 752 3100
                                        Fax: +1 650 853 1038
8

9                                       *Attorneys for Plaintiff Reputation.com, Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR RESCISSION/REFORMATION AND FRAUD